**METLIFE CAPITAL CORPORATION, Plaintiff,**

v.

**WATER QUALITY INSURANCE SYNDICATE, et al., Defendants.**

**No. CIV.A.97–2615 (HL).**

United States District Court, D. Puerto Rico.

May 26, 2000.

91

Antonio M. Bird–Jr., Bird, Bird & Hes-
tres, San Juan, PR, Heidi S. Downey, Blo-
gle & Gates, Seattle, WA, Delbert D. Mil-
ler, Seattle, WA, John W. Fried, John P.
Winsbro, Joan L. Lewis, Fried & Epstein,
New York City, for Plaintiff.

John M. Woods, Cliona A. Jennings, Jo-
seph G. Grasso, Thacher Proffitt & Wood,
Jonathan Rogin, Thacher Proffitt & Wood,
New York City, Jonathan Rogin, Thacher
Proffitt & Wood, New York City, Keith A.
Graffam, Graffam & Biaggi, Dario Rivera–

Carrasquillo, Pinto–Lugo & Rivera, Harry A. Ezratty, San Juan, PR, Thomas M. Rittweger, Nicoletti Hornig & Sweeney, New York City, Juan A. Ramos–Diaz, Francisco J. Amundaray–Rodriguez, San Juan, PR, for Defendants.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Plaintiff Metlife Capital Corporation ("MCC") brings suit against its insurer Water Quality Insurance Syndicate ("WQIS"), among others, for breach of an insurance contract. See P.R. Laws Ann. tit. 26, § 1114(1) (1997) (providing that "[t]he written instrument in which a contract of insurance is set forth is the policy"). The parties agree that in this admiralty and diversity action, the law of Puerto Rico is applicable to the controversies presented. See *United States Fire Ins. Co. v. Producciones Padosa, Inc.*, 835 F.2d 950, 953 (1st Cir.1987) (taking into account both *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and "the parties' concession as to the applicable rules" in applying Puerto Rico law to the insurance dispute).

The parties, as well as the Court, recognize that there is a dearth of Puerto Rico law on the precise issues of insurance law presented in this dispute. See *Id.* (saying that "although the central dispute in this case arises from an insurance policy, the Insurance Code of Puerto Rico seems to us to shed precious little light on the question [presented here]"). In the absence of applicable Puerto Rico law, "the practice of the Puerto Rico Supreme Court 'has been to use the most advanced rules in North American law and civil law ....' " *Event Producers, Inc. v. Tyser & Co.*, 854 F.Supp. 35, 38 (D.P.R.1993) (citing *Municipality of San Juan v. Great American Ins. Co.*, 813 F.2d 520, 523 (1st Cir.1987)), *aff'd*, 37 F.3d 1484 (1st Cir.1994).

MCC and WQIS have both filed motions for summary judgment and oppositions. See Dkt. Nos. 115, 118, 119, 126, and 127.

This Opinion and Order deals only with the core controversy presented in this action, namely, the coverage dispute between MCC and WQIS. For reasons that follow, the Court hereby grants MCC's motion for summary judgment and denies WQIS' motions for summary judgment.

## Standard for Summary Judgment

The Court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining if a material fact is "genuine," the Court does not weigh the facts but, instead, ascertains whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir.1995).

Once a party moves for summary judgment, it bears the initial burden. Specifically, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] ... which it believes demonstrate the absence of a genuine issue of material fact." *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 1598 n. 22, 140 L.Ed.2d 759 (1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once this threshold is met, the burden shifts to the nonmoving party. The nonmovant may not rest on mere conclusory allegations or wholesale denials. Fed. R.Civ.P. 56(e); *Libertad v. Welch*, 53 F.3d 428, 435 (1st Cir.1995). Instead, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Further, the

nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Of course, the Court draws inferences and evaluates facts "in the light most favorable to the nonmoving party." *Leary*, 58 F.3d at 751 (1995).

## Statement of Facts

The facts in this case are essentially undisputed by the parties. This insurance coverage dispute arises from an oil spill in San Juan, Puerto Rico on January 7, 1994. On that date, the tug M/V Emily S was towing the barge Morris J. Berman out of the port of San Juan when the tow wire ruptured, allowing the barge to run aground 100 yards off of Punta Escambron. At the time of the grounding, the Bunker Group entities ("Bunker Group") operated the tug and owned and operated the barge. MCC owned the tug. Massive litigation ensued. That litigation (the "underlying litigation") is the background of the instant case.[1]

As a result of the suit brought against MCC and others by the governments of Puerto Rico and the United States and by private plaintiffs, MCC has expended resources in excess of $5 million in its defense. At the time of the grounding, however, MCC was insured by WQIS under a Marine Pollution Liability Policy. This policy requires WQIS "to reimburse the insured[ ] for costs and expenses incurred for investigation of or defense of ... claims alleging the sudden and unintentional discharge of petroleum products." Dkt. No. 145. The parties do not dispute that the January 7, 1994 oil spill falls within the policy's coverage.

The first complication between the parties arose due to WQIS' use of its counsel, Thacher Proffitt & Wood, to defend two of its insureds in the underlying litigation. Thus, Thacher Proffitt & Wood was assigned by WQIS to defend both MCC and the Bunker Group. It is undisputed in the instant case that the nature of the defenses potentially asserted by MCC and the Bunker Group in the underlying litigation place their interests squarely in conflict.[2] Thus, the Court finds that there existed a conflict of interest between MCC and WQIS. WQIS attempted to rectify the situation by authorizing MCC to seek independent counsel of its own choosing.[3] Eventually, MCC selected the law firms of Bogle & Gates, LLC ("Bogle & Gates"), of Seattle, Washington and Calvesbert & Brown

---

1. In addition to the underlying litigation, the oil spill also gave rise to criminal proceedings. See *United States v. Rivera*, 131 F.3d 222 (1st Cir.1997).

2. Although WQIS makes much of the difference between "potential" and "actual" conflicts of interest, a potential conflict of interest, if significant, is a conflict of interest *simpliciter*. See 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 202:20 (3rd ed.1999). The Court need not detain itself with the niceties of the distinction between potential and actual conflicts of interest. Thus, WQIS' assertion that it "never attempted to subvert or interfere with the complete and vigorous defense of the claims asserted against MCC" has no effect on the existence of a conflict of interest. See Dkt. No. 145.

3. One of the most common conflicts of interest presented in the context of liability insurance is when the insurer insures two or more insureds with adverse interests. See Richard L. Neumeier, Serving Two Masters: Problems Facing Insurance Defense Counsel and Some Proposed Solutions, 77 Mass. L.Rev. 66, 80 (1992). In such cases, it is generally accepted that in order to comply with its duty to defend the insured, the insurer must either retain or authorize the insured to retain independent counsel at the expense of the insurer. See 14 Couch on Insurance § 202:24; 1 Allan D. Windt, Insurance Claims & Disputes §§ 4.22–4.24 (3rd ed.1995); 7C Appleman, Insurance Law and Practice § 4685.01 (Berdal ed.1979). See also, *St. Paul Fire and Marine Ins. Co. v. Weiner*, 606 F.2d 864 (9th Cir.1979) (applying California law and cited in Couch on Insurance); *Allied American Ins. Co. v. Ayala*, 247 Ill.App.3d 538, 186 Ill.Dec. 717, 616 N.E.2d 1349 (1993) (cited in Couch on Insurance); *Wolpaw v. General Acc. Ins. Co.*, 272 N.J.Super. 41, 639 A.2d 338 (1994) (cited in Couch on Insurance).

of Puerto Rico. WQIS approved MCC's selection.

Besides Thacher Proffitt & Wood's representation of both MCC and the Bunker Group, MCC cites three other grounds for the existence of a conflict between MCC and WQIS. First, MCC points to the fact that WQIS reserved its right to deny coverage under the policy. Although an insurer's defense under a reservation of rights may give rise to a conflict of interest, it need not do so.[4] MCC simply has not adequately fleshed out its arguments as to how WQIS' reservation of rights constitutes a conflict of interest. Accordingly, the Court shall not consider this assertion by MCC.

█ Second, MCC indicates that WQIS advised MCC that its potential liability was significantly higher than the limits of liability under the policy. Absent exceptional circumstances, though,

> [t]he fact that damages requested by the plaintiff in the underlying tort litigation exceed the limits of the insurance policy does not generally amount to a conflict of interest sufficient to require appointment of independent counsel.

14 Couch on Insurance § 202:30. Thus, the fact that WQIS advised MCC that it potentially faced significant liability created no conflict of interest.

█ Third and finally, MCC argues that a conflict of interest was created by virtue of WQIS' being named as a defendant in the underlying litigation via Puerto Rico's direct action statute. The mere fact that WQIS became a defendant along with MCC, without more, suggests nothing as to the adversity of WQIS and MCC's interests in that litigation. Thus, MCC's argument in this respect fails.

Because of the conflict of interest between WQIS and MCC arising from Thacher Proffitt & Wood's representation of the Bunker Group, MCC assumed that

WQIS would finance MCC's defense in accordance with the contract of insurance between them. This assumption proved mistaken, as WQIS eventually refused to pay any of MCC's legal expenses arising from the defense of the underlying litigation. Upon WQIS' refusal to pay, MCC filed this lawsuit on November 5, 1997.

## Discussion

### 1. The Contractual Prior Consent Provision

The contract of insurance between MCC and WQIS contains a so-called "prior consent clause" that requires that MCC seek WQIS' prior approval of any expenditures by MCC in defending itself. See Dkt. No. 145. The parties agree that this clause is part of the contract of insurance between them, and they further agree that any unexcused failure to comply by MCC would result in WQIS' absolution of responsibility for MCC's legal fees and other expenditures. Further, there is no dispute that MCC has been fully aware of the prior consent clause since it entered into the contract of insurance. The relevant policy language is as follows: "Notwithstanding any provision in this Policy to the contrary, this Policy does not provide coverage for any cost or expense incurred by the Assured without the prior consent of WQIS." Dkt. No. 145.

### 2. The Conflict of Interest

After the oil spill in January of 1994, WQIS informed MCC that it would defend and indemnify MCC in accordance with the terms of the insurance contract between them. To this end, WQIS further informed MCC that WQIS had retained the services of the law firms of Thacher Proffitt & Wood and Jimenez, Graffam & Lausell to defend WQIS' various insureds in the underlying litigation. Citing a conflict of interest, MCC rejected WQIS' chosen counsel.

---

4. See 14 Couch on Insurance §§ 202:26–202:29; 1 Insurance Claims & Disputes § 4.26.

MCC essentially makes two arguments regarding the applicability of the policy's prior consent clause. First, MCC argues that Thacher Proffitt & Wood, counsel for WQIS, initially represented clients with adverse interests, thus creating a conflict of interest for WQIS.[5] In other words, WQIS' counsel represented both MCC and the Bunker Group. To remedy this conflict, WQIS allowed MCC to seek independent counsel. While this was sufficient to protect MCC's interests in the underlying litigation, MCC argues that this measure alone did not avoid all of the conflicts that eventually arose in connection with the prior consent clause. Because Thacher Proffitt & Wood continued to represent the Bunker Group, WQIS' counsel still represented a client with interests adverse to those of MCC.

This imperfect alignment of interests only presented a problem, according to MCC, in the context of the insurance policy's prior consent clause. As long as WQIS and its counsel were not participating in MCC's defense in the underlying case, conflicting interests could cause no harm to MCC. After the divorce that MCC's retention of independent counsel wrought, however, the prior consent clause remarried MCC to WQIS' counsel. This marriage operated in the following manner. The prior consent clause required MCC to approach WQIS, whose counsel represented a client with interests adverse to those of MCC, to seek pre-approval of any and all expenditures by MCC's hereto-

fore-independent counsel. According to MCC, this requirement seriously compromised the independence of its representation by allowing Thacher Proffit & Wood to have a veto power of sorts over the conduct of its defense in the underlying litigation.

### 3. The Effect of the Conflict of Interest on MCC's Duty to Seek WQIS' Prior Consent

■ In the eyes of MCC, the prior consent clause renders MCC vulnerable to the conflict of interest that precipitated its retention of independent counsel in the first place. For that reason, MCC argues, the prior consent clause is utterly without effect in this case, and WQIS is not entitled to exercise *any* control over the conduct of MCC's defense. MCC, in turn, is bound by the caveat that WQIS need only reimburse MCC for its *reasonable* defense expenditures.

■ The opinions of the leading commentators in the field of insurance law suggest agreement with MCC on this point. Although the law specifically treating the enforceability of prior consent clauses in conflict-of-interest cases is sparse, the law treating the general duties of the insured and insurer in conflict-of-interest cases is usefully applied in the instant case. The general rule is that when the interests of the insurer and the insured diverge, the insurer must take steps to remedy the situation.[6] In this case, WQIS complied with this duty by authoriz-

---

5. "[W]hen an insurer is obligated to provide defenses for two or more insureds with adverse interests, there is a sufficient conflict of interests that the insurer must provide independent counsel for each insured at its own expense ...." 14 Couch on Insurance § 202:24. See also, 1 Insurance Claims & Disputes §§ 4.22–4.24; *St. Paul Fire and Marine Ins. Co. v. Weiner*, 606 F.2d 864 (1979); *Allied American Ins. Co. v. Ayala*, 247 Ill. App.3d 538, 186 Ill.Dec. 717, 616 N.E.2d 1349 (1993); *Wolpaw*, 272 N.J.Super. 41, 639 A.2d 338.

6. See 14 Couch on Insurance § 202:20 (saying that in the event of a conflict of interest

between insurer and insured, when the insured chooses to reject the insurer's defense, "independent counsel may be appointed, ... [and] the insurer's duty to defend is transformed into a duty to reimburse the insured for defense costs ...."); 1 Insurance Claims & Disputes § 4.22; 7C Appleman, Insurance Law and Practice § 4685.01. See also *Pepper Const. Co. v. Casualty Ins. Co.*, 145 Ill.App.3d 516, 99 Ill.Dec. 448, 495 N.E.2d 1183 (1986) (cited in Couch on Insurance); *Grand Cove II Condominium Ass'n, Inc. v. Ginsberg*, 291 N.J.Super. 58, 676 A.2d 1123 (1996) (cited in Couch on Insurance).

ing MCC to appoint independent counsel. In such cases, the general rule is that the insurer cedes control over the insured's defense to the insured's independent counsel.[7] This cession of control is consistent with the insurer's paying for the insured's defense. In fact, the insurer's compliance with its duties under the policy requires as much. The protection for the insurer from runaway legal fees is the principle that the insurer need only pay those fees that are "reasonable."[8]

In the instant case, WQIS has denied its liability for *any* of MCC's defense-related expenses. This position is not consistent with WQIS' obligation to pay MCC's reasonable defense-related expenses.

### 4. Estoppel

 MCC further argues that even if the prior consent clause remained in force at the time of the events of this case, WQIS is estopped from attempting to enforce the clause against MCC. The parties do not dispute that MCC failed to seek prior approval from WQIS for its expenditures. MCC argues, however, that starting on or about April 18, 1994, MCC began to remit its bills for legal fees directly to WQIS' counsel. Over the next three and one-half years, MCC, through its Senior Vice President and General Counsel, Paul Graf, made numerous unsuccessful attempts to solicit WQIS' approval or objections concerning the nature and magnitude of the items billed to MCC by its counsel. Not until October 24, 1997, after MCC had submitted its bills to WQIS on 31 separate occasions, did counsel for WQIS voice its objection to MCC's failure to comply with the policy's prior consent clause. According to MCC, this lapse of approximately three and one-half years constituted good reason for MCC to believe and to rely on the belief that WQIS was satisfied with MCC's procedures regarding the handling of bills between MCC and WQIS.

Providing further support for MCC's assertion that WQIS is estopped from invoking the prior consent clause is WQIS' November 13, 1996 letter to MCC. In that letter, WQIS responded substantively to MCC's billing inquiries for the first time. The letter indicated that counsel for WQIS would recommend that WQIS reimburse only 45.7% of Bogle & Gates' bills and 22% of Calvesbert & Brown's bills. This letter suggests an outright approval by WQIS of a discounted portion of MCC's bills.[9] Such an approval, with no mention of the policy's prior consent clause, constitutes a waiver by WQIS of its rights under the prior consent clause.[10]

---

7. "Although the insurer, pursuant to its duty to defend, may pick up the 'tab' for the insured's lawyer, the insurer must, unless insured consents, relinquish all control over the lawyer once the insurer and insured turn out to have antagonistic interests." 14 Couch on Insurance § 202:37. See also 1 Insurance Claims & Disputes § 4.22; 7C Appleman, Insurance Law and Practice § 4685.01; *Matter of New Era, Inc.,* 135 F.3d 1206 (7th Cir. 1998) (applying Illinois law and cited in Couch on Insurance).

8. When independent counsel is appointed, "[s]uch situations often end up in a dispute over the amount the insurer is required to pay the insured's personal counsel. It is generally recognized that the insurer only owes reasonable attorney's fees and disbursements which are measured by the custom and practice within the applicable jurisdiction." 14 Couch on Insurance § 202:20.

9. The reason for the discounting is not clear based on the parties' filings.

10. "[A] waiver may be implied from any act or pattern of conduct by the insurer or its authorized agents which reasonably tends to create a belief in the mind of the claimant under the policy that [a specified act] will be unnecessary." 13 Couch on Insurance § 194:21. Further, "[b]y specifying a certain or particular defect or defects in [an insured's actions], it has been held that an insurer waives all other defects therein." *Id.* at § 195:6. See also *Globe & Rutgers Ins. Co. of City of New York v. Prairie Oil & Gas Co.,* 248 F. 452 (2nd Cir.1917) (cited in Couch on Insurance); *Young v. California Ins. Co.,* 55 Idaho 682, 46 P.2d 718 (1935) (cited in Couch on Insurance). Although it is not clear what defect led to WQIS' discounting of MCC's bills, that defect was certainly not a failure to comply with the prior consent clause. Such a

WQIS, on the other hand, argues that it timely asserted its rights under the prior consent clause by sending representatives to attend a meeting with representatives of MCC and Bogle & Gates. At this meeting, the attendees discussed the procedures by which MCC could comply with the policy's prior approval clause. WQIS argues that it further avoided waiving its rights by providing MCC with a list of prior consent Guidelines outlining the means by which MCC could comply with the prior consent clause, among other terms and conditions in the policy. While WQIS' efforts certainly contributed to MCC's being on notice of its duties under the prior consent clause, these efforts in no way prevent the estoppel effects of WQIS' three and one-half years of inaction.

In addition to its arguments regarding meeting with and issuing its Guidelines to MCC, WQIS points out that MCC demanded from WQIS less than full reimbursement of its defense-related expenditures. In correspondence between MCC and WQIS, Paul Graf of MCC requested only "fair and equitable" reimbursement. Dkt. No. 145. According to WQIS, this constitutes a concession by MCC that it had been failing to comply with the terms of the policy and that it only deserved as much reimbursement as WQIS' generosity might allow. The Court disagrees. Quite to the contrary, MCC's request for a "fair and equitable" sum suggests only reasonableness on the part of MCC and a desire to avoid the kind of major litigation that this dispute has spawned. Further, there is no inconsistency between MCC's request for a "fair and equitable" amount and its position that the law requires

WQIS to reimburse it for its "reasonable" defense-related expenditures.

■ WQIS goes on to argue that estoppel can not operate to create insurance coverage for which the contracting parties have not bargained. See *Nieves v. Intercontinental Life Insurance Co. of Puerto Rico*, 964 F.2d 60, 66 (1st Cir.1992); *City of Hope Nat'l Medical Center v. Seguros de Servicios de Salud de Puerto Rico, Inc.*, 983 F.Supp. 68, 77 (D.P.R.1997), *aff'd*, 156 F.3d 223 (1st Cir.1998). The very passage that WQIS cites in support of this proposition, however, makes clear that "a forfeiture of benefits contracted for in an insurance policy may be waived." *Nieves*, 964 F.2d at 66. Further, as MCC argues, application of the principle of estoppel in this case does not extend the insured's coverage to a new class of risk; rather, it prevents the insurer from invoking a forfeiture of benefits. See Dkt. No. 126.

The Court agrees with MCC's arguments regarding estoppel. MCC's repeated attempts to obtain reimbursement from WQIS and its repeated requests for WQIS' comments regarding its bills are sufficient to have placed the onus onto WQIS to speak up if it had any objection to MCC's bills. See *Rosario v. Atlantic Southern Ins. Co. of Puerto Rico*, 1968 WL 17268, 95 P.R.R. 759 (1968) (stating that "[t]he principles of waiver and estoppel, which are active throughout our law, are of special application in the law of insurance on account of the adhesive nature of said contracts"). WQIS' failure to do so for a period of years estops WQIS from asserting MCC's noncompliance with the precise requirements of the prior consent clause.[11]

---

defect would have caused WQIS to refuse to pay *any* of MCC's bills.

**11.** "The majority view is that good faith requires that the insurer notify the insured of its objection within a reasonable time, or within time to make any necessary correction or supply additional information, if the notice or proofs are considered defective in any way, and that if the insurer fails to make its objection known within a reasonable time, remains silent, or proceeds to act as though the notice

or proof were adequate and satisfactory, it is estopped from defending an action on the policy on the ground of noncompliance with the contract requirements, or the deficiencies may be deemed waived, at least where there has been some apparent attempt on the part of the insured to comply with the requirements as to furnishing the necessary proof of loss." 13 Couch on Insurance § 195:4. Although this passage refers specifically to the filing of defective notice or proof of loss by an

### 5. WQIS' Consent to Independent Counsel as Blanket Consent to MCC's Expenditures

MCC asserts that even in the absence of a conflict of interest, the policy's prior consent clause does not require MCC to obtain WQIS' prior consent to every defense-related expenditure. Instead, WQIS' approval of MCC's retention of independent counsel serves as an approval of all reasonable defense-related expenses that MCC might incur.

WQIS, on the other hand, argues that its approval of independent counsel did not operate as blanket consent to reimburse all costs and fees incurred by MCC. Of course, MCC does not claim that WQIS' approval of its choice of independent counsel constituted consent to *all* of MCC's expenditures. MCC only claims that WQIS consented to MCC's *reasonable* expenditures. In any event, the Court has already determined that both the existence of a conflict of interest in this case and WQIS's estoppel rendered the policy's prior consent clause inoperative. Thus, this issue is moot.

### 6. Prejudice

MCC argues further that even if it wrongfully failed to comply with the policy's prior consent clause, WQIS was not prejudiced by that failure. See *Municipality of San Juan v. Great American Ins. Co.*, 117 P.R. Dec. 632, 636 (1986). See also *Municipality of San Juan*, 813 F.2d at 521. In light of the Court's resolution of MCC's conflict-of-interest and estoppel arguments, the Court need not inquire into whether WQIS was prejudiced by MCC's actions.

### 7. MCC's Retention of Counsel Who Were Not Approved by WQIS

■ Aside from the parties' dispute over WQIS' liability for legal fees incurred by MCC in retaining Bogle & Gates and Calvesbert & Brown, there is an additional dispute over WQIS' liability. WQIS argues that even if it is liable for legal fees charged by Bogle & Gates, it is not liable for fees charged by other law firms hired by MCC. After the dissolution of Bogle & Gates in 1999, MCC retained other law firms to represent its interests. MCC failed to get WQIS' prior consent to these firms' representation, as MCC had previously done with respect to Bogle & Gates and Calvesbert & Brown's representation.

In spite of MCC's failure to acquire WQIS' prior consent, WQIS' is still liable for reasonable fees incurred by MCC in retaining these firms. After notifying WQIS of its intention to find new counsel, MCC learned that WQIS was unwilling to reimburse fees charged by the new counsel. In light of this, MCC acted reasonably in retaining counsel. MCC had no obligation at this point to attempt to return to WQIS for approval of its fee arrangements with the new counsel. WQIS is adequately protected from a disadvantageous fee arrangement by the requirement that it pay only the *reasonable* fees incurred by MCC.

### 8. MCC's Claims of Unfair Practices, Bad Faith, and Obstinacy

MCC claims that WQIS should be held liable for engaging in unfair practices in claim adjustments in violation of P.R. Laws Ann. tit. 26, § 2716a (1997); for the tort of bad faith refusal to pay an insurance claim, see *Event Producers*, 854 F.Supp. at 39; and for obstinacy under Puerto Rico Rule of Civil Procedure 44.1(d) (Lexis Supp.1997). The Court finds that MCC has failed to put forth sufficient evidence of WQIS' obstinacy to avoid summary judgment in favor of WQIS on these claims. See *Dopp v. Pritzker*, 38

---

insured, its logic is equally applicable to the instant case. See also *Scottish Union & Nat'l Ins. Co. v. McKone*, 227 F. 813 (8th Cir.1915) (cited in Couch on Insurance); *Prudential Ins. Co. of America v. Stewart*, 286 F. 321 (9th Cir.1923) (cited in Couch on Insurance);

*Dairyland County Mut. Ins. Co. v. Keys*, 568 S.W.2d 457 (1978) (cited in Couch on Insurance); *Maskas v. North American Acc. Ins. Co.*, 279 Mass. 523, 181 N.E. 750 (1932) (cited in Couch on Insurance).

F.3d 1239, 1252 (1st Cir.1994); *Reyes v. Banco Santander de P.R., N.A.,* 583 F.Supp. 1444, 1446 (D.P.R.1984) (holding that "[t]he Puerto Rico rule on obstinacy was not designed as a premium to successful litigants, but rather as a penalty to be imposed on those litigants whose conduct in pursuing a course of action borders on unreasonable pertinaciousness"). These claims are hereby dismissed with prejudice.

### Conclusion

The Court thus finds that WQIS is liable to MCC for MCC's reasonable legal expenses incurred in connection with its defense in the underlying litigation. If the parties are unable to reach a settlement, this amount shall be determined at a hearing to be held in lieu of the bench trial scheduled in this case on June 22, 2000. After the June 22, 2000 hearing, the Court shall instruct Defendants Traveler's and Westchester as to its schedule for filing further materials in this case. Partial judgment dismissing with prejudice the unfair practices, bad faith, and obstinacy claims shall be entered accordingly.

**IT IS SO ORDERED.**